STATE OF CONNECTICUT *v.* TODD LAMAR JONES
(AC 28038)

Flynn, C. J., and DiPentima and Peters, Js.

---

Argued October 29, 2008—officially released March 24, 2009

*Richard E. Condon, Jr.*, assistant public defender, for the appellant (defendant).

*Adam E. Mattei*, special deputy assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *C. Robert Satti, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Todd Lamar Jones, appeals from the judgment of conviction, rendered after a trial to the court, of transporting cocaine with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), as set forth in count one of the long form information, two counts of possession of cocaine with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), as set forth in counts two and three of the long form information, and interfering with an officer in violation of General Statutes (Rev. to 2005) § 53a-167a (a), as set forth in count four of the information.[1] On appeal, the defendant claims that the trial

---

[1] The defendant was acquitted on a charge of interfering with a search in violation of General Statutes § 54-33d as set forth in count five of the long form information. The court also found that the state had failed to prove that the defendant was a persistent drug offender pursuant to General Statutes §§ 21a-277 and 21a-278 as charged in a part B information. Following the defendant's conviction, the court merged counts one and two—illegal transport of cocaine and one count of possession of cocaine with intent to sell—for purposes of sentencing. The defendant then was sentenced to a total effective term of sixteen years incarceration, suspended after ten years, with five years of probation.

court improperly denied his motion to suppress certain evidence after concluding that (1) the police had not subjected him to a seizure or, in the alternative, that the police had a reasonable and articulable suspicion justifying the seizure, and (2) he did not have standing to challenge the legality of the evidence seized from his hotel room. We affirm the judgment of the trial court.

The court reasonably could have found the following facts, which are relevant to our resolution of the issues on appeal. On August 22, 2005, Detective Fred Wilcoxson of the Stratford police department parked his vehicle at St. Michael's Cemetery on Stratford Avenue in Stratford to monitor the activities at the Stratford Motor Inn (motel), which is located across the street from the cemetery. The defendant, driving a green Chevrolet Lumina, drove into the motel parking lot and exited his vehicle, leaving open the driver's side door of the vehicle. His passenger, Roy Jones, remained in the vehicle. The defendant walked quickly and entered room four. Just a few minutes later, he returned to his vehicle and drove out of the parking lot. Wilcoxson became suspicious and followed the defendant's vehicle.

Shortly thereafter, the defendant stopped his vehicle at a traffic light, and Wilcoxson drove alongside him. Wilcoxson then observed the defendant drinking from a bottle of beer. Wilcoxson contacted Stratford Officer Ulysses Munoz via the walkie-talkie component of his cellular telephone, asking him to intercept the defendant because the defendant was drinking beer while operating a motor vehicle. Wilcoxson and Munoz spoke several times while Munoz was en route to the defendant's location. Before Munoz had the opportunity to stop the defendant's vehicle, the defendant parked on Yale Street several feet from the curbing. Munoz, without activating the siren or emergency lights, parked approximately one car length behind the defendant's

vehicle and approached it on foot. As Munoz approached the driver's side door, he saw the defendant hand a Heineken bottle to his passenger. Munoz asked the defendant for his license, insurance card and vehicle registration. The defendant stated that he did not have a valid driver's license, but he gave Munoz the other documents that he had requested. Munoz then walked to the passenger side of the vehicle and requested that the passenger provide identification, which he did. Munoz saw two Heineken bottles behind the legs of the passenger, and he asked the passenger to exit the vehicle. As the passenger exited, Munoz saw Wilcoxson approaching the vehicle. The defendant then began moaning, complaining of cramps, while bending over toward the passenger's seat and fumbling around in his waistband. Wilcoxson asked the defendant to put his hands up, but the defendant did not comply. Wilcoxson then told the defendant to exit the vehicle; the defendant complied but continued to hunch over and fumble around his waistband. When the defendant stood straight up, a bag of crack cocaine fell from his shorts and landed on the ground. The defendant tried to stomp on the drugs. After a brief scuffle, Wilcoxson and Munoz handcuffed the defendant and placed him under arrest. When the defendant stood up after being handcuffed, several more bags of crack cocaine fell from his shorts.

Wilcoxson and several other officers went back to the motel and questioned employees about the occupants of room four. The employees showed Wilcoxson a picture of the defendant, and they confirmed that the motel key card seized from the defendant was for room four. Wilcoxson and other officers then went to room four and knocked on the door. A young boy answered the door, and Wilcoxson saw a woman, later identified as the defendant's girlfriend, Sharonda Tuck, and two bags of marijuana lying on a nightstand in plain view. Tuck admitted that the marijuana belonged to her, and she

was arrested. Wilcoxson and the other officers searched the motel room and found other drugs and drug paraphernalia and a pistol.

On the basis of these facts, the defendant was convicted of transporting cocaine with intent to sell, two counts of possession of cocaine with intent to sell and interfering with an officer.[2] This appeal followed.

## I

On appeal, the defendant first claims that the court improperly denied his motion to suppress after concluding that the police had not subjected him to a seizure or concluding, in the alternative, that the police had a reasonable and articulable suspicion justifying a seizure. The defendant claims that the seizure violated article first, §§ 7[3] and 9,[4] of the constitution of Connecticut. Although we conclude that the court improperly found that the defendant was not subjected to a seizure at the time Munoz asked him for his driver's license, insurance card and vehicle registration, we agree with the court's alternative finding that the investigatory seizure was justified because the police had a reasonable and articulable suspicion of illegal activity.

Our rules of practice provide: "Upon motion, the judicial authority shall suppress potential testimony or other evidence if it finds that suppression is required under the constitution or laws of the United States or the state of Connecticut." Practice Book § 41-12; see also General Statutes § 54-33f. "Our standard of review of a trial court's findings and conclusions in connection

---

[2] See footnote 1.

[3] Article first, § 7, of the constitution of Connecticut provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ."

[4] Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance. . . . In [a] case, in which we are required to determine whether the defendant was seized by the police, we are presented with a mixed question of law and fact that requires our independent review." (Citations omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843–44, 955 A.2d 43 (2008). "When considering the validity of a . . . stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d 981 (2004).

A

The defendant claims that the court improperly concluded that he was not subjected to a seizure. We agree.

Our Supreme Court recently articulated "the legal test used to determine when a person is seized within the meaning of article first, §§ 7 and 9, of our state constitution. . . . [A] person is seized when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . The key consideration is whether, in view of all the circumstances surrounding

the incident, a reasonable person would have believed that he was not free to leave. . . . The inquiry is objective, focusing on a reasonable person's probable reaction to the officer's conduct. See, e.g., [id., 503] ([i]n determining the . . . question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard . . .)." (Citations omitted; internal quotation marks omitted.) *State* v. *Burroughs*, supra, 288 Conn. 844–46.

We begin by determining whether there was a sufficient show of authority by the police to constitute a seizure. "A proper analysis of this question is necessarily fact intensive, requiring a careful examination of the entirety of the circumstances in order to determine whether the police engaged in a coercive display of authority such that a reasonable person in the defendant's position would not have felt free to leave. . . . In *United States* v. *Mendenhall*, [446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)], the Supreme Court listed a number of factors that, 'in view of all of the circumstances surrounding the incident,' might indicate a sufficient show of authority to create a seizure. 'Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' Id.; see also *Michigan* v. *Chesternut*, 486 U.S. 567, 575, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988) ('[T]he police conduct involved . . . would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the] respondent's freedom of movement. The record does not reflect that the police activated a siren or flashers; or that they commanded [the] respondent to

halt, or displayed any weapons; or that they operated the car in an aggressive manner to block [the] respondent's course or otherwise control the direction or speed of his movement.')." *State* v. *Burroughs*, supra, 288 Conn. 846–47.

In *Burroughs*, our Supreme Court determined that the defendant in that case was not subjected to a seizure when two officers approached his vehicle, one on each side of the vehicle, because there was no showing of authority or use of physical force. Id., 840–52. The court did explain, however, that its conclusion would be different if the police had parked behind the defendant's vehicle and activated the police siren, thereby demonstrating their authority: "[A] reasonable person in the defendant's position would not have felt free to leave if . . . the officers . . . had demonstrated their authority by pulling up behind the defendant's vehicle and activating their patrol car's overhead flashing lights." Id., 851.

We also find informative the recent holding in *State* v. *Silva*, 285 Conn. 447, 939 A.2d 581 (2008). In *Silva*, our Supreme Court determined that a refusal to produce motor vehicle documents when requested by an officer, in accordance with General Statutes § 14-217, may constitute a violation of § 53a-167a, interfering with an officer.[5] Id., 456–57; see also *State* v. *Aloi*, 280 Conn 824,

---

[5] General Statutes § 14-217 provides in relevant part: "No person who is operating or in charge of any motor vehicle, when requested by any officer in uniform . . . may refuse to give his name and address or the name and address of the owner of the motor vehicle or give a false name or address, or refuse, on demand of such officer, agent or other person, to produce his motor vehicle registration certificate, operator's license and any automobile insurance identification card . . . . Violation of any provision of this section shall be an infraction."

General Statutes (Rev. to 2005) § 53a-167a provides: "(a) A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer or firefighter in the performance of such peace officer's or firefighter's duties.

"(b) Interfering with an officer is a class A misdemeanor."

832–33, 911 A.2d 1086 (2007) (refusal to provide identification to police when asked may interfere with officer's ability to perform duty and thus may violate § 53a-167a).

In the present case, we conclude that once Munoz approached the defendant's vehicle and requested that the defendant produce his documents, thereby exercising police authority, the defendant was not free to leave and was under seizure. Pursuant to § 14-217, the defendant was required to produce those documents under penalty of law. A refusal to produce them may have subjected him to a violation of § 14-217, as well as a misdemeanor charge of interfering with an officer pursuant to § 53a-167a. Accordingly, we conclude that the defendant was under seizure once Munoz requested that he produce his documents; no reasonable person in the defendant's position would have felt free to leave. See *State* v. *Burroughs*, supra, 288 Conn. 846.

B

Having determined that the defendant was subjected to a seizure once Munoz requested that he produce his documents, we next must determine whether Munoz possessed a reasonable and articulable suspicion at the time of the seizure. See *State* v. *Santos*, supra, 267 Conn. 503. The defendant argues that the "court improperly concluded that Munoz had a reasonable and articulable suspicion based on: (1) the transmission from Wilcoxson regarding [the defendant's] drinking while driving in [the] defendant's car; (2) Munoz' observation, when approaching the [defendant's vehicle], of [the] defendant handing the passenger a Heineken bottle and (3) parking illegally in violation of a Stratford town ordinance." He also argues that the stop was pretextual. We are not persuaded.

"Pursuant to *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), a police officer has the authority,

under the fourth amendment to the United States constitution, to stop the operator of a car if the officer has a reasonable and articulable suspicion that the operator has engaged in illegal conduct. In furtherance of this constitutional principle, our Supreme Court has held that a police officer has the right to conduct a *Terry* stop even if the reason for the stop is only that the officer observed an infraction under our traffic laws. *State* v. *Dukes*, 209 Conn. 98, 122, 547 A.2d 10 (1988)." *State* v. *Cyrus*, 111 Conn. App. 482, 483, 959 A.2d 1054 (2008).

"Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . What constitutes a reasonable and articulable suspicion depends on the totality of the circumstances. . . . The determination of whether a specific set of circumstances provides a police officer with a reasonable and articulable suspicion of criminal activity is a question of fact for the trial court and is subject to limited appellate review. . . .

"An appeal challenging the factual basis of a court's decision that a reasonable and articulable suspicion exists requires that we determine, in light of the record taken as a whole, (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the [court's] conclusion that those facts gave rise to such a suspicion is legally correct." (Internal quotation marks omitted.) *State* v. *Thomas*, 98 Conn. App. 542, 548–49, 909 A.2d 969 (2006), cert. denied, 281 Conn. 910, 916 A.2d 53 (2007).

In the present case, the trial court concluded that the seizure of the defendant was not pretextual and that Munoz had a reasonable and articulable suspicion

based on the court's findings that (1) Wilcoxson reported to Munoz that he saw the defendant drinking while operating his motor vehicle, which is a class C misdemeanor punishable by a maximum of three months imprisonment pursuant to General Statutes §§ 53a-36 and 53a-213, (2) as Munoz approached the defendant's vehicle, he personally observed the defendant handing his passenger a Heineken beer bottle and (3) the defendant parked his vehicle more than one foot from the curb in violation of a Stratford town ordinance.

The defendant contends that the court initially found some inconsistencies and credibility issues in the testimony of Munoz and Wilcoxson, especially related to the timing of Wilcoxson's observation of the defendant drinking and the fact that the officers did not secure the beer bottles for evidence.[6] He then contends that the court's stated findings in its articulation on the issue of reasonable and articulable suspicion were at odds with its initial findings, which, he claims, demonstrates that there is a fundamental flaw in the evidence. The defendant further argues that the court's finding that he was parked illegally was clearly erroneous because he was parked for only two to three minutes while in the vehicle, and the parking ordinance at issue "presumes that an owner or operator will *not* be in the car when notice of the violation issued." (Emphasis in original.) He asks that we conclude that the court improperly found that he parked illegally under these facts or, in the alternative, that such illegal parking does not provide a constitutionally sufficient justification for a seizure. After thoroughly reviewing the record, we conclude that the court's findings were not clearly erroneous, that the record supports the court's conclusion

---

[6] We note that "[t]he determination of a witness' credibility is the special function of the trial court. This court cannot sift and weigh evidence." (Internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 227, 673 A.2d 1098 (1996).

that the seizure of the defendant was not pretextual and that Munoz had a reasonable and articulable suspicion justifying a seizure of the defendant.

As our Supreme Court has explained: "A police officer has the right to stop a motor vehicle operating on a Connecticut highway even if the reason for the stop is only an infraction under our traffic laws." *State* v. *Dukes*, supra, 209 Conn. 122. Parking more than one foot from the curbing on a public road is an infraction under General Statutes § 14-251[7] and Stratford Town Ordinances § 203-8.[8] Here, Munoz testified that he observed that the defendant was parked "several feet" from the curbing, which testimony was credited by the trial court in its findings. [9] Because this finding is supported by the record, we conclude that the defendant has failed to prove that it was clearly erroneous.

[7] General Statutes § 14-251 provides in relevant part: "No vehicle shall be permitted to remain stationary . . . upon the traveled portion of any highway except upon the right-hand side of such highway in the direction in which such vehicle is headed; and, if such highway is curbed, such vehicle shall be so placed that its right-hand wheels, when stationary, shall, when safety will permit, be within a distance of twelve inches from the curb. . . . Nothing in this section shall be construed to . . . prohibit a vehicle from stopping . . . on any highway within the limits of an incorporated city, town or borough where the parking of vehicles is regulated by local ordinances. Violation of any provision of this section shall be an infraction."

[8] Stratford Town Ordinance § 203-8 provides in relevant part: "A. When there is a violation of this Article by a person, a member of the Police Department shall attach to the vehicle in violation a notice to the owner or operator thereof that such vehicle has been parked in violation of the provisions of this Article and directing such owner or operator to report to the officer on duty in the Police Department in regard to such violation. Each such owner or operator shall, within 10 days of the time when such notice was attached to his vehicle, pay to such desk officer as a penalty for and in full satisfaction of such violation the following amounts:

"(1) Group I. Penalty: $25.

"(a) No-parking zone . . .

"(h) Too far from curb . . . ."

[9] The defendant does not contest that he was parked more than one foot away from the curbing, nor does he directly challenge Munoz' testimony that he was parked "several feet" from the curbing.

Next, we examine the defendant's contention that § 203-8 of the Stratford Town Ordinances does not apply if the driver remains in the vehicle while parked several feet from the curbing. The defendant attempts to distinguish *State* v. *Gordon*, 84 Conn. App. 519, 524–25, 854 A.2d 74, cert. denied, 271 Conn. 941, 861 A.2d 516 (2004), from the facts of this case. Similar to counsel in the present case, appellate counsel in *Gordon* had argued in his appellate brief that parking in a no parking zone did not give the police a reasonable and articulable suspicion warranting further investigation but, rather, that it simply authorized the police to leave a ticket on the vehicle's windshield. We conclude that the facts of this case are not distinguishable, in any meaningful way, from the relevant facts in *Gordon*.

In *Gordon*, the defendant parked his vehicle on the side of the road in an area marked with several no parking signs and remained parked there for approximately three minutes. Id., 521. A police officer was concerned because of the hazards posed by parking in such an area, and he approached the defendant's vehicle to see if assistance was needed. Id., 521–22. After speaking with the driver of the vehicle, the police officer determined that the defendant was intoxicated and arrested him. Id., 522. The court found that "the defendant was parked illegally in violation of General Statutes § 14-251 when the officers approached his vehicle and concluded that that violation provided the officers with a reasonable and articulable suspicion that a crime was being committed." Id., 523. In upholding the trial court's determination, we explained that the police officer "had a reasonable and articulable suspicion to approach the defendant's vehicle *because* it was parked in a no parking zone." (Emphasis added.) Id., 525.

In the present case, the defendant was parked illegally, "several feet" from the curbing on a public roadway. Munoz testified that he witnessed this and

approached the vehicle. The defendant admits that he, like the defendant in *Gordon*, had been parked for two to three minutes. Accordingly, we do not find the facts of *Gordon* substantially distinguishable from the facts in the present case. Applying an objective standard to these circumstances, as we must, we conclude that the court properly found that the defendant parked his vehicle in violation of § 203-8 of the Stratford Town Ordinances and General Statutes § 14-251, and we further conclude, therefore, as we did in *Gordon*, that the police officer had a reasonable and articulable suspicion to approach the defendant's vehicle because it was parked illegally. On this basis alone, the investigatory seizure was justified. Accordingly, we need not review the additional basis for the court's conclusion, having concluded that there was a reasonable and articulable suspicion justifying the investigatory seizure because the defendant was parked illegally. We will examine, however, the defendant's contention that the seizure was pretextual.

The defendant also argues that, even if there was a reasonable and articulable suspicion on which Munoz could have effected a valid seizure, Wilcoxson followed the defendant and requested that Munoz stop him for pretextual reasons, raising an issue concerning what the defendant terms "preconceived culpability" or the "insidious specter of profiling" because the defendant "is a young black male."[10] In effect, the defendant asks

---

[10] In *State* v. *Dalzell*, 282 Conn. 709, 716 n.5, 924 A.2d 809 (2007), our Supreme Court explained that it has not "defined the term 'pretextual' stop, and [it did] not do so in [the *Dalzell*] case . . . ." The court noted, however, that the defendant in that case had claimed that a "pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop. The classic example . . . occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity." (Internal quotation marks omitted.) Id. In the present case, the defendant does not set forth a definition of "pretextual," but he implicitly uses a definition similar to that in *Dalzell*.

that we hold that it is the subjective intent of the officers that should govern our determination of whether a motor vehicle stop is pretextual. As the Supreme Court held in *Whren* v. *United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996), an objective standard is employed to test whether the action of law enforcement violates the fourth amendment to the United States constitution. Because Munoz had a reasonable and articulable suspicion, which objectively was based on investigating the defendant's illegally parked vehicle, Munoz' investigatory seizure was justified under the fourth amendment. Although the defendant argues that this allegedly pretextual stop also violated the state constitution, he provides no analysis under our state constitution. "We . . . repeatedly [have] apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Sinvil*, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004).

II

The defendant next claims that the court improperly denied his motion to suppress certain evidence after concluding that he did not have standing to challenge "the legality of items seized without a warrant in room four of the motel." The defendant argues that the court's ruling was improper because additional evidence "adduced at trial confirmed that [he] had standing," and, therefore, the court improperly denied the defendant's motion to reconsider the ruling on his motion to suppress and improperly denied his motion to suppress. We do not agree.[11]

[11] Although the state urges us to employ the abuse of discretion standard, applicable to our review of a court's ruling on a motion for reconsideration, we conclude that such a standard is inapplicable in this case because the

We again note our standard of review of a trial court's findings and conclusions in connection with a motion to suppress. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . .

"The touchstone to determining whether a person has standing to contest an allegedly illegal search is whether that person has a reasonable expectation of privacy in the invaded place. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . In order to meet this rule of standing . . . a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact specific inquiry into all the relevant circumstances. . . . Furthermore, [t]he defendant bears the burden of establishing the facts necessary to demonstrate a basis for standing . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Kalphat*, 285 Conn. 367, 374–75, 939 A.2d 1165 (2008). "[T]he trial court's finding [on the question of standing] will not be overturned unless it is legally or logically inconsistent with the facts found or involves an erroneous rule of law." (Internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 93, 675 A.2d 866 (1996).

court, in effect, granted the motion to reconsider but denied the requested relief.

"It is well established that the owner or tenant of a dwelling has standing to contest the legality of a search of that premises. . . . However, [t]he capacity to claim the protection of the fourth amendment does not depend upon a proprietary interest, permanency of residence, or payment of rent but upon whether the person who claims fourth amendment protection has a reasonable expectation of privacy in the invaded area. . . . Further, the fact that a person does not have the exclusive use of an area does not bar his having a reasonable expectation of privacy that furnishes standing to object to a government seizure. . . . Accordingly, a person who makes a telephone call from a public telephone booth may challenge the state's warrantless interception of the call . . . and an overnight guest has the right to contest a warrantless entry into his or her host's home. . . . Thus, a person may have a sufficient interest in a place other than his home to enable him to be free in that place from unreasonable searches and seizures . . . so long as the place is one in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy." (Citations omitted; internal quotation marks omitted.) Id., 93–94.

The following facts, discerned from the record, are necessary for our resolution of the defendant's claim. During the suppression hearing, the defendant called Wilcoxson to the witness stand for the purpose of "showing standing." Wilcoxson testified that he obtained a motel key card from the defendant during his arrest and that, after the defendant was arrested, Wilcoxson went to the motel office. He also stated that the key card he obtained from the defendant was for room number four. When asked if he saw "any photographs . . . of a resident of the [motel]" upon inquiry at the motel office, Wilcoxson responded, "I saw a picture of [the defendant]." He further stated that the photograph that he saw of the defendant related to room

number four. After going to room number four, Wilcoxson testified, he knocked on the door, and a female answered; there also was a young child in the room. He then testified that it was the child who actually opened the door while the woman sat inside the room.

In its April 4, 2006 oral ruling regarding the issue of standing, the court, *Hauser, J.*, stated in relevant part: "[T]he court further concludes that the defendant has not established standing in the search of unit number four nor in the items seized therein. The defendant points to the fact that he possessed . . . a key card to that room . . . [and] to a picture of the defendant which was in the possession of the office of the [motel], and that picture related to unit number four. He finally points out that the inventory form filed by the police listed unit four as the defendant's home address. It should be noted that the tow form [for the defendant's vehicle] also made out by the police indicated Bridgeport as [the defendant's] address, as did the certified copy of the motor vehicle registration offered by the defendant. His [identification] card listed Waterbury as his address.

"There is no evidence that [the defendant] was the one who actually rented room number four. There is no evidence that he paid for the room. There is no evidence that he ever stayed at the room. There is no evidence asserting that any personal property in the room belonged to him. The evidence indicates that his only personal contact with unit four came when he parked near that unit, went very quickly inside, leaving the car door opened, carrying nothing, and returned to his car in a very short time, again carrying nothing. There's no evidence that he used a key to open the door. . . . There was no evidence of the occupant sharing the room with him. There was no testimony from anyone concerning his asserted status." On the basis of these findings, the court concluded that the defendant had

not demonstrated that he had standing to challenge the legality of the search of room number four of the motel or the items seized therein.

The defendant claims that he had a reasonable expectation of privacy in room four of the motel and, therefore, that the court improperly concluded that he lacked standing to challenge the search thereof. The defendant does not argue that the evidence he submitted at the suppression hearing alone was sufficient to establish that he had standing to contest the legality of the search of room number four. Rather, he argues that the court's denial of his motion to reconsider this ruling after further evidence was produced at trial was improper because that additional evidence proved that the defendant had standing. The defendant claims that, taking all of the evidence into consideration, the court improperly denied his motion to suppress the search of room number four and the evidence found therein. We are not persuaded.

As the trial court, *Hauser, J.*, observed in its April 4, 2006 oral ruling regarding the issue of standing, although the defendant had a key card for room number four and that was the address listed for the defendant on the police inventory form, the tow form and his motor vehicle registration listed Bridgeport as his address, and his identification card listed Waterbury as his address. The court also found that there was no evidence that the defendant was the person who rented room number four, paid for room number four or had any personal property in room number four.

The defendant argues, however, that further evidence was presented at trial that established that he was, in fact, the person who had rented room number four and that it was "his room." The defendant contends that this additional evidence, taken together with the previous evidence, was sufficient to establish his standing to

contest the search of room number four and the evidence seized therefrom and that the court abused its discretion when it denied his motion to reconsider the issue of standing and his motion to suppress. The state urges that we not consider the evidence offered at trial, before a different judge, in assessing the propriety of the initial ruling that the defendant did not possess standing to challenge the search of room number four. It argues that the defendant failed in his burden of proof at the suppression hearing and that any additional evidence offered at the time of trial should not be used to evaluate the earlier ruling. Accordingly, it contends that the only ruling we should consider is the ruling on the motion for reconsideration. Assuming, without deciding, that the evidence offered at trial properly may be considered when determining the propriety of the denial of a motion to suppress when the court has been asked to reconsider its ruling following the presentation of the additional evidence at trial; see generally *State v. Lewis*, 60 Conn. App. 219, 245 n.28, 759 A.2d 518 (recognizing that to determine whether a defendant's constitutional rights have been infringed, appellate court must review record in entirety and not just evidence before trial court at time of ruling, but finding it significant that defendant never asked trial court to reconsider findings made at suppression hearing in light of trial testimony), cert. denied, 255 Conn. 906, 762 A.2d 911 (2000); we conclude, on the basis of the entire record before us, that the defendant has failed to prove that the court, *Thim, J.*, improperly ruled that there remained insufficient evidence that the defendant had a reasonable expectation of privacy in room number four.

The defendant directs us to the trial testimony of Tuck, his then girlfriend, which he claims "standing alone proves that [he had] a legitimate expectation of privacy in room four of the motel." The defendant contends that Tuck testified that she and her son "had been

living with the defendant for approximately thirty days in room four" and that "it was his room." The state responds by arguing that "the trial court implicitly rejected Tuck's testimony when it stated, after listening to her testify, that it did not hear anything that would cause it to change Judge Hauser's decision." The state also argues that because "the trial court was free to reject Tuck's testimony, it did not abuse its discretion in denying the defendant's motion for reconsideration."

During trial, defense counsel argued that, in addition to being the defendant's then girlfriend, Tuck also was his codefendant, charged with possession of the same narcotics for which the defendant was charged, those found in room number four. Defense counsel explained that Tuck was "being offered leniency for her testimony" against the defendant. After being called to the witness stand, Tuck testified at the defendant's trial in the presence of her attorney. She stated that on the evening of August 22, 2005, she and her son were in room number four of the motel and that she awoke to find several police officers in her room. The officers asked her for permission to search the room, and she granted them permission. She stated that the police first found two bags of marijuana on the top of the nightstand and that the marijuana belonged to her. After searching further, the police found a gun, crack cocaine and a scale, and, she stated, those items did not belong to her.

Tuck further testified that she and her son had been in room number four for approximately thirty days, and she acknowledged that "the defendant [had] come to that room on other days before the day of August 22, 2005." She also stated that she had never seen the defendant do anything with the items that the police found during their search. She testified that she did have an agreement with the state that she would "testify to the stuff that does not belong to [her and own] up to what

belongs to [her]. That's the marijuana." She further stated that a charge of risk of injury to a child, a weapons charge and a possession of crack cocaine charge "would be throw[n] out" and that her testimony at the defendant's trial would not be used against her.

When cross-examined by defense counsel, Tuck testified that she lived in room number four but that she had no knowledge of the gun hidden between the box spring and the mattress or the crack cocaine hidden inside the nightstand. She had never seen those items nor had she seen the defendant with those items. When asked by defense counsel: "So, you didn't know it was there. You don't know if he knew it was there, right?" She responded: "It was his room. If it was—it's not mine, so who else would it have been?" She then stated that she was living and sleeping there and that the defendant was staying with her in that room.

Following Tuck's testimony, the defendant filed a motion to reconsider his motion to suppress and asked the court to be heard on the motion. During oral argument on the motion, defense counsel stated that he "obviously [did not] want to waive any claim that [he might] have to asking Judge Hauser to reconsider his ruling on the motion to suppress." Nevertheless, he argued the merits of the motion before Judge Thim and did not request that it be heard by Judge Hauser. The defendant argued that Tuck's testimony that the room belonged to him provided the additional evidence necessary to prove that he had standing to challenge the search of room number four. Following argument, the court stated: "Judge Hauser's ruling is the rule of the case, and I have seen—I have heard nothing before me such that I should change his decision. So the motion for reconsideration is denied."

The defendant contends that the mere words of Tuck stating that "it was his room" sufficed to establish the

defendant's standing. We are not persuaded. Tuck admitted that she was given leniency in exchange for her testimony against the defendant. She also testified that she was motivated to testify, at least in part, by the thought of her three children. Although, during cross-examination, she stated that it was the defendant's room, she also stated that she and her son lived and slept in that room and that she had no knowledge of the gun or the crack cocaine that was found in the room. There is nothing in the record to indicate what portion, if any, of Tuck's testimony the court found credible. It is the province of the trial court to accept or reject, in whole or in part, the testimony of a witness. See *State* v. *Goodspeed*, 107 Conn. App. 717, 728–29, 946 A.2d 312 ("In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the [finder of fact], and, therefore, we must afford those determinations great deference. . . . The [finder of fact] can . . . decide what—all, none or some—of a witness' testimony to accept or reject." [Citation omitted; internal quotation marks omitted.]), cert. denied, 287 Conn. 920, 951 A.2d 570 (2008). Accordingly, we are unable to conclude that the court improperly concluded that Tuck's testimony did not provide sufficient additional evidence to establish the defendant's standing to challenge the search of room number four.

The judgment is affirmed.

In this opinion the other judges concurred.