******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# POINTE RESIDENTIAL BUILDERS BH, LLC *v.* TMP CONSTRUCTION GROUP, LLC, ET AL.
## (AC 44063)

Alvord, Prescott and Clark, Js.

*Syllabus*

The plaintiff general contractor sought to recover damages for, inter alia, an alleged violation of the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.), in connection with a breach of contract claim between the plaintiff and the defendants, a subcontractor, T Co., and its manager, P. Under the contract, T Co. was to perform certain work on a construction project to build a condominium complex at a fixed sum. Although the contract called for payment upon delivery for furnished materials and equipment, the defendants convinced the plaintiff to pay a 30 percent deposit for all of the estimated costs of materials and equipment up front, claiming that the deposit would be used to buy materials ahead of time to avoid an anticipated price increase and to avoid delivery delays. Unknown to the plaintiff, the defendants did not intend to use these funds as promised but, instead, intended to use the funds to finance its payroll and work on other projects. When the invoices for supplies remained unpaid by the defendants, a mechanic's lien was placed on the property and, thereafter, the plaintiff terminated the contract. The trial court concluded that the defendants breached the contract, inter alia, in failing to perform the work and to pay for materials, equipment and labor used, and that the defendants were unjustly enriched. It also found the defendants' conduct was deceptive, unethical and unscrupulous and constituted an unfair and deceptive business practice in violation of CUTPA. On the defendants' appeal to this court, *held*:

1. Contrary to the defendants' claims, there was sufficient evidence of intentional, reckless, unethical and unscrupulous conduct by both defendants to establish a violation of CUTPA: the record supported a finding that P, as the manager and controlling member of T Co., knowingly or recklessly engaged in the unscrupulous acts, because he personally represented to the plaintiff that the deposit would be used for materials, labor, and overhead for the plaintiff's project, and P controlled how the deposit was ultimately spent; moreover, the court's finding of ascertainable loss was not clearly erroneous, as the court expressly found that, although the plaintiff deposited a certain sum of money, the plaintiff only received value in completed work in an amount less than the deposit and, accordingly, there was little question that the difference between the money paid and the value received constituted an ascertainable loss for the purposes of CUTPA.

2. The court did not abuse its discretion in awarding the plaintiff punitive damages, as the evidence sufficiently supported the court's findings that the defendants' false representations to the plaintiff that the deposit would be used to purchase materials and rent equipment was intentional, deceptive, unethical, and unscrupulous and that the defendants fully intended to use the deposit to fulfill obligations under other projects unrelated to the plaintiff's project; moreover, the record also supported the court's finding that it was known to P that T Co. was in a shaky financial condition when it convinced the plaintiff to pay the deposit and, thus, these findings supported the court's conclusion that the defendants acted with reckless indifference to the plaintiff's rights; furthermore, the court did not abuse its discretion in awarding attorney's fees to the plaintiff, as the court properly found that the defendants violated CUTPA.

Argued November 17, 2021—officially released June 28, 2022

*Procedural History*

Action to recover damages for, inter alia, a violation of the Connecticut Unfair Trade Practices Act, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Hon. Edward T. Kru-*

*meich II*, judge trial referee; judgment for the plaintiff, from which the defendants appealed to this court; thereafter, the court, *Hon. Edward T. Krumeich II*, judge trial referee, awarded attorney's fees and costs to the plaintiff, and the defendants filed an amended appeal. *Affirmed.*

*James Colin Mulholland*, for the appellants (defendants).

*Opinion*

CLARK, J. This appeal arises out of a contract for the construction of a condominium complex in Greenwich. The defendants, TMP Construction Group, LLC (TMP), and Olin Paige III, appeal from the judgment of the trial court, rendered in favor of the plaintiff, Pointe Residential Builders BH, LLC,[1] following a trial to the court. On appeal, the defendants claim that the court erred by rendering judgment for the plaintiff with respect to the plaintiff's count alleging a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and the plaintiff's count alleging unjust enrichment. We conclude that the court did not improperly render judgment on the plaintiff's CUTPA claim. In light of this conclusion, we need not address the defendants' claims pertaining to the unjust enrichment claim.[2] Accordingly, the judgment of the trial court is affirmed.

The following procedural history and facts, as found by the trial court, are relevant to this appeal. In a three count complaint dated June 1, 2018, the plaintiff alleged that the defendants breached a construction contract between the parties, that the defendants were unjustly enriched, and that they violated CUTPA. Following a trial to the court, the court issued a memorandum of decision on February 18, 2020. The court found that the plaintiff, as general contractor, entered into a construction contract with TMP, as subcontractor, dated December 8, 2016 (contract), in relation to the construction of a condominium complex in Greenwich (project). At the time, Paige was the manager and controlling member of TMP. Under the contract, TMP was to perform certain work on the project at a fixed contract sum of $1,071,500. Although the contract called for payment upon delivery for furnished materials and equipment stored on-site, TMP convinced the plaintiff to pay an upfront 30 percent deposit for all of the estimated costs of materials and equipment by representing that those funds would be used to buy the materials ahead of time to avoid an anticipated 20 percent price increase on drywall and to avoid delays on the delivery of material needed for the first few weeks on the job. Relying on these representations, the plaintiff paid TMP $305,377.50 on December 13, 2016, which had been requisitioned by TMP for "material procurement".

Unknown to the plaintiff (but known to the defendants), TMP was "in a shaky financial condition" when it persuaded the plaintiff to pay the deposit. The court found that "TMP did not intend to use these funds to acquire materials and equipment for the project but, instead, intended to use the funds to finance its payroll and work on other projects."[3] In particular, TMP intended to use the funds from the deposit to fund its obligations under an unrelated subcontract with Viking Construction, Inc. (Viking), dated December 27, 2016,

for a project in Bridgeport (Bridgeport project) that would occur simultaneously with the project that is the subject of this appeal.

The court found that "TMP's financial house of cards came tumbling down" when Viking demanded that TMP increase its workforce on the Bridgeport project. The court stated: "Unlike the contract with [the plaintiff], [TMP's] subcontract with Viking was not frontloaded and TMP was paid on a thirty day net basis, based on detailed payment requisition forms. When it increased its labor force in response to Viking's demands, TMP could not carry its payroll. TMP also was not able to pay its principal materialman, Marjam Supply Company ('Marjam'), which also supplied materials for the project. When Viking refused to pay TMP and later terminated its subcontract in May, 2017, TMP used the balance of funds in its account to make payroll. Paige decided the remaining funds would not be used to pay state and federal taxes or to pay its suppliers. Marjam had a balance due on the Bridgeport project of $147,000. Marjam was owed $70,617.32 on the project for materials delivered but not paid for by TMP. Marjam placed a mechanic's lien in that amount on the property . . . . The mechanic's lien has not been released, remains on the property and is subject to a pending foreclosure action . . . to which [the plaintiff] is not a party." Due to TMP's failure to perform in accordance with the contract, the plaintiff sent TMP notices of default on June 22 and December 12, 2017. The contract ultimately was terminated by the plaintiff on December 17, 2017.

With respect to the breach of contract claim, the court concluded that the contract was properly terminated and that TMP breached the contract by its failure (1) to perform the work, and to promptly cure defaults upon written notice, (2) to pay the difference between the value of the completed work and the amounts requisitioned and paid to TMP, (3) to pay for materials, equipment and labor used in the period covered by the requisitions, and (4) to furnish satisfactory evidence of completed work upon request by the plaintiff. The court, however, concluded that the plaintiff failed to satisfy its burden of proving damages in accordance with the provision of the contract entitling it to replacement costs, stating that the "witnesses' estimate of 'approximately $500,000' premium paid to replacement subcontractors seems to have been a guess plucked out of the air and is not credible."

The court also found that TMP was unjustly enriched. It found that "[u]nder the circumstances here, the injustice was TMP's deceiving [the plaintiff] into paying a deposit not required under the contract and requisitioned in violation of contract terms and under false pretenses. TMP and Paige never intended to use the deposit to order materials and equipment for the project as represented. There is no remedy under the contract

for restitution of the deposit wrongfully requisitioned.''[4]

As to the CUTPA claim, the court found that the defendants' conduct was "deceptive, unethical and unscrupulous and constituted an unfair and deceptive business practice" in violation of the statute. It found that "Paige was aware the deposit was requisitioned for material procurement for the project but was not intended or used for the purposes represented, but failed to disclose this contrary intention to [the plaintiff]. Paige used the funds provided by [the plaintiff] to pay other expenses of TMP unrelated to the project. Moreover, the financial circumstances and needs of TMP were such that Paige was aware that TMP would not be able to finish the project or pay [the plaintiff] back if TMP's expenses grew or cash flow was disrupted and recklessly exposed [the plaintiff] to this risk."

The court found that "[t]he damages for unjust enrichment and the actual damages recoverable under CUTPA . . . are the same under the facts proven here: $224,878, the net of the $305,378 deposit paid less the $80,500 stated value in the requisition for [the] completed work. This sum represents the unjust benefit received by TMP and also equals the actual loss sustained by [the plaintiff] . . . .'' The court also awarded punitive damages pursuant to General Statutes § 42-110g (a) in the amount of $225,000 because it found that the "defendants' conduct in requisitioning a deposit specifically for material purchases with the intention of diverting the funds for other uses and depleting the funds for purposes unrelated to the project was intentional, wilful and done with reckless indifference to [the plaintiff's] rights." In concluding that the plaintiff proved its CUTPA claim, the court exercised its discretion and awarded reasonable attorney's fees. In its memorandum of decision, the court ordered the plaintiff to submit an affidavit as to fees and costs.[5] The court rendered judgment in the amount of $463,519.77, in favor of the plaintiff on February 18, 2020. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendants make various claims pertaining to the court's judgment in favor of the plaintiff on its CUTPA claim. The defendants argue that (1) the evidence does not support a finding that either defendant engaged in aggravating unscrupulous conduct, that Paige knowingly or recklessly engaged in unfair or unscrupulous acts with respect to TMP's taking of the deposit, that the plaintiff suffered any ascertainable loss of money or property due to a CUTPA violation, or that either defendant engaged in conduct or practices that violated the so-called cigarette rule; and (2) that the court abused its discretion by awarding the plaintiff "double" damages and attorney's fees and costs. We disagree.

We turn now to the legal principles that guide our resolution of the defendants' claims. CUTPA provides

that: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). "Any person who suffers any ascertainable loss of money . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . ." General Statutes § 42-110g (a).

"[I]n determining whether a practice violates CUTPA we have adopted the criteria [previously] set [forth] in the cigarette rule by the [Federal Trade Commission] for determining when a practice is unfair: (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." (Internal quotation marks omitted.) *Kent Literary Club of Wesleyan University* v. *Wesleyan University*, 338 Conn. 189, 232, 257 A.3d 874 (2021).

"It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Pedrini* v. *Kiltonic*, 170 Conn. App. 343, 353, 154 A.3d 1037, cert. denied, 325 Conn. 903, 155 A.3d 1270 (2017). "In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 694–95, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011). "A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Emphasis omitted; internal quotation marks omitted.) *Osborn* v. *Waterbury*, 197 Conn. App. 476, 482, 232 A.3d 134 (2020), cert. denied, 336 Conn. 903, 242 A.3d 1010 (2021).

I

We first address the defendants' claim that the trial

court improperly found that both TMP and Paige, in his individual capacity, had violated CUTPA. Specifically, they claim that the record does not support a finding of aggravating unscrupulous conduct by either defendant and that the evidence does not support a finding that Paige "knowingly or recklessly" engaged in unfair or unscrupulous acts. They further contend that the court's finding that the plaintiff suffered an ascertainable loss due to a CUTPA violation was clearly erroneous. We disagree.

In cases involving claims of breach of contract, our courts repeatedly have held that the same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation. See *Ulbrich* v. *Groth*, 310 Conn. 375, 410, 78 A.3d 76 (2013); see also *Medical Device Solutions, LLC* v. *Aferzon*, 207 Conn. App. 707, 777, 264 A.3d 130, cert. denied, 340 Conn. 911, 264 A.3d 94 (2021). That being said, "not every contractual breach will rise to the level of a CUTPA violation." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 228, 990 A.2d 326 (2010). "In the absence of aggravating unscrupulous conduct, mere incompetence [in performing a contract] does not by itself mandate a trial court to find a CUTPA violation." Id., 229. In cases where the facts that establish a breach of contract are the same as those relied on to support a CUTPA claim, "our focus . . . has been on whether the defendant's breach of contract was merely negligent or incompetent, in which case the CUTPA claim was barred, or whether the defendant's actions would support a finding of *intentional, reckless, unethical or unscrupulous conduct,* in which case the contractual breach will support a CUTPA claim under the second prong of the cigarette rule." (Emphasis added.) *Ulbrich* v. *Groth*, supra, 410; see also *IN Energy Solutions, Inc.* v. *Realgy, LLC*, 114 Conn. App. 262, 274–75, 969 A.2d 807 (2009) (breach of sales contract did not constitute CUTPA violation when trial court specifically found that plaintiff failed to prove that defendant's breach was unethical, unscrupulous, wilful or reckless).

With respect to whether and under what circumstances an individual may be held liable under CUTPA, our Supreme Court has made clear that "[t]he plain language of § 42-110b clearly indicates that an individual can be liable for a CUTPA violation." *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 587, 119 A.3d 570 (2015). "In order for any individual liability to attach under CUTPA, someone must knowingly or recklessly engage in unfair or unscrupulous acts, as contemplated by the statute, in the conduct of a trade or business." Id., 592. To prevail on a CUTPA claim against an individual based on a business entity's conduct, a plaintiff must prove "(1) the entity's violation of CUTPA; (2) the individual's participation in the acts or practices, or the authority to control them; and (3) the individual's

knowledge of the wrongdoing at issue." *Onofrio* v. *Mineri*, 207 Conn. App. 630, 643, 263 A.3d 857 (2021).

The following additional facts, as found by the trial court, are relevant to our disposition of the defendants' claims. The court found that Paige, who was the manager and controlling member of TMP, was aware that TMP requisitioned the deposit for the purported reason that TMP needed that money for material procurement for the project but that TMP, in fact, did not intend to use the deposit for the purposes represented, and that he failed to disclose this contrary intention to the plaintiff. The court found that the "defendants' conduct in requisitioning a deposit specifically for material purchases with the intention of diverting the funds for other uses and depleting the funds for purposes unrelated to the project was intentional, willful and done with reckless indifference to the [plaintiff's] rights." "Moreover, the financial circumstances and needs of TMP were such that Paige was aware that TMP would not be able to finish the project or pay [the plaintiff] back if TMP's expenses grew or cash flow was disrupted and recklessly exposed [the plaintiff] to this risk." If necessary, the defendants would use strategic defaults on payments to suppliers to extend credit terms until more cash came into TMP's account. Later, Paige sought to shift supplier costs to the plaintiff and to Viking by involving the contractors in material purchases and equipment rental.[6] The court further found that "TMP's and Paige's business plan and practice to finance the project, the Viking project, and various other ongoing projects, was literally 'robbing Peter to pay Paul,' " finding that this conduct was "deceptive, unethical and unscrupulous."

The defendants argue that the "evidence does not support a finding of aggravating unscrupulous conduct by either defendant." They also contend that "without addressing the aggravation factor," the court improperly held against the defendants on the CUTPA claim.

First, the defendants' contention that the court did not address the "aggravating" nature of their conduct lacks any merit. The court's memorandum of decision goes to great lengths to detail the defendants' conduct, which it ultimately found to be, inter alia, intentional, deceptive, unethical, and unscrupulous, in that the defendants fully intended for TMP to use the plaintiff's deposit for materials and equipment to fulfill its obligations on other projects unrelated to the plaintiff's project, despite the defendants' representations to the contrary. The court also found that Paige was aware of the purported reasons given for the deposit but nonetheless "used the funds provided by [the plaintiff] to pay other expenses of TMP unrelated to the project." Accordingly, to say that the court did not address the "aggravation factor" is simply incorrect.

Turning our attention to the court's findings as to the

aggravating unscrupulous conduct of both TMP and Paige, we conclude that there is sufficient evidence in the record to support those findings. The record, which includes both documentary and testimonial evidence, discloses, inter alia, that upon request from TMP, the plaintiff paid to TMP an up-front deposit in the amount of $305,377.50, despite the fact that the contract between the parties did not require any deposit. E-mails admitted into evidence, in addition to testimony at trial, show that TMP represented to the plaintiff that it needed this money up front in order to secure materials for the project, including for the purpose of buying drywall before prices went up "another 20 [percent] in January." Daniel Goldstone, the managing director for the plaintiff, testified at trial that the deposit was requested to "purchase materials" for the project. Paige himself confirmed at trial that he represented "to [Goldstone] directly . . . that we required a deposit on the job because we're not a big company. . . . It was intended to support that project to get it off the ground and continue it through whether that be labor, material, overhead, whatever it took to get to the next step."

Despite TMP's representations, the record shows that TMP did not use the deposit money for materials on the project. Goldstone testified that he learned months after making the deposit that TMP had failed to pay Marjam, the company that TMP contracted with to secure the materials for the project, for the materials needed for project. In light of this nonpayment, Marjam placed a mechanic's lien on the property.

Goldstone further testified that when he confronted Paige regarding this nonpayment, Paige admitted that TMP did not pay Marjam and that it used the deposit money "to fund payroll for . . . other projects in hopes that he would be able to complete those projects and be able to put the money back into our project to pay for those materials." Paige himself confirmed in his testimony at trial that he requested the deposit to get the project "off the ground and continue it through whether that be labor, material, overhead, whatever it took to get to the next step," but nevertheless testified that, because TMP did not get "paid hundreds of thousands of dollars for payroll" on the Viking project, TMP "elected to take the remaining funds from the TMP account and pay all of our employees." After discussing with Paige these nonpayment issues and other nonperformance issues, the plaintiff sent a formal default letter to TMP on June 22, 2017. Goldstone testified that TMP failed to cure any items identified in the letter, which prompted the plaintiff to terminate the contract. According to Goldstone, "[b]asically everything that [TMP was] contracted to do was not complete, so in essence everything needed to be completed."

In light of the foregoing, in addition to other evidence in the record, we conclude that there is sufficient evi-

dence of intentional, reckless, unethical or unscrupulous conduct to establish a violation of CUTPA under the second prong of the cigarette rule. See *Ulbrich* v. *Groth,* supra, 310 Conn. 410 ("our focus in such cases has been on whether the defendant's breach of contract was merely negligent or incompetent, in which case the CUTPA claim was barred, or whether the defendant's actions would support a finding of intentional, reckless, unethical or unscrupulous conduct, in which case the contractual breach will support a CUTPA claim under the second prong of the cigarette rule"). The evidence also supports a finding that Paige knowingly or recklessly engaged in the unscrupulous acts, as he was the manager and controlling member of TMP; he personally represented to the plaintiff that the deposit would be used for materials, labor, and overhead for the plaintiff's project; and he controlled how the deposit was ultimately spent. We accordingly cannot conclude that the court's findings are clearly erroneous.

The defendants also argue that it was clearly erroneous for the court to render judgment against them pursuant to CUTPA because the evidence does not support a finding that the plaintiff suffered any ascertainable loss of money or property due to a CUTPA violation. This claim lacks merit.

"[T]o be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation. . . . CUTPA, however, is not limited to providing redress only for consumers who can put a precise dollars and cents figure on their loss . . . as the ascertainable loss provision do[es] not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case. . . . Rather . . . [d]amage . . . is only a species of loss . . . hence [t]he term loss necessarily encompasses a broader meaning than the term damage. . . . Accordingly . . . for purposes of § 42-110g, an ascertainable loss is a deprivation, detriment [or] injury that is capable of being discovered, observed or established. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known. . . . Under CUTPA, there is no need to allege or prove the amount of the actual loss." (Emphasis omitted; internal quotation marks omitted.) *Kelly* v. *Kurtz*, 193 Conn. App. 507, 536–37, 219 A.3d 948 (2019). "Of course, a plaintiff still must marshal some evidence of ascertainable loss in support of [its] CUTPA allegations, and a failure to do so is indeed fatal to a CUTPA claim . . . ." (Internal quotation marks omitted.) *Herron* v. *Daniels*, 208 Conn. App. 75, 100, 264 A.3d 184 (2021).

The court expressly found that, although the plaintiff made a deposit in the amount of $305,378, the plaintiff only received value in completed work in the amount of $80,500. There can be little question that the difference between the money paid and the value received consti-

tuted an ascertainable loss for purposes of CUTPA. Because the court's findings are supported by evidence in the record, we cannot conclude that the court's finding of ascertainable loss was clearly erroneous.

## II

The defendants next claim that the court abused its discretion by ordering the defendants to pay "double damages" under CUTPA. They also contend the court's award of counsel fees cannot stand because there was no proven CUTPA claim. For the reasons set forth herein, we disagree.

The court awarded the plaintiff $224,878 in compensatory damages for the differential between the deposit paid by the plaintiff and the value of the work actually provided by TMP. The court also ordered the defendants to pay an additional $225,000 in punitive damages because the court found "that the defendants' conduct in requisitioning a deposit specifically for material purchases with the intention of diverting the funds for other uses and depleting the funds for purposes unrelated to the project was intentional, wilful and done with reckless indifference to [the plaintiff's] interest." At the conclusion of its memorandum of decision, the court also awarded reasonable attorney's fees and ordered the plaintiff to file an affidavit as to fees and expenses, with attached documentation. After receiving the plaintiff's affidavit, the court awarded the plaintiff $13,040 in reasonable attorney's fees and $601.77 in costs.

At the outset, we note that, although the defendants purport to challenge the court's award of "double damages," the court did not, in fact, award the plaintiff double damages. Rather, the court awarded punitive damages in addition to compensatory damages. We accordingly construe the defendants' first argument as challenging the court's award of punitive damages.

Section 42-110g (a) provides in relevant part: "The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper." General Statutes § 42-110g (d) further provides: "In any action brought by a person under this section, the court may award to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. . . ."

"Awarding punitive damages and attorney's fees under CUTPA is discretionary . . . and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done. . . . In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Citation omitted; footnote omitted; internal quotation marks

omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. Awarding punitive damages based on a multiple of a plaintiff's actual damages "is a recognized method for determining punitive damages under CUTPA." *Staehle* v. *Michael's Garage, Inc.*, 35 Conn. App. 455, 463, 646 A.2d 888 (1994).

In determining whether a punitive damages award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, we look to the factors that the United States Supreme Court discussed in *Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 503, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008). See *Ulbrich* v. *Groth*, supra, 310 Conn. 454. Those factors included "the degrees of relative blameworthiness, i.e., whether the defendant's conduct was reckless, intentional or malicious; [among other factors]." (Citations omitted; internal quotation marks omitted.) Id.

Under the circumstances of the present case, we conclude that the court did not abuse its discretion in awarding the plaintiff punitive damages in the amount of $225,000. See id., 456 (although punitive damages award in amount of $1,251,000 was large, especially in light of compensatory award in amount of $417,000, court cannot conclude that award constituted abuse of discretion). As we concluded in part I of this opinion, the evidence supports the court's findings that the defendants' false representations to the plaintiff that the deposit would be used to purchase materials and rent equipment was intentional, deceptive, unethical, and unscrupulous in that they fully intended for TMP to use the deposit to fulfill obligations under other projects unrelated to the plaintiff's project. The evidence in the record also supports the court's finding that it was known to Paige that TMP was in a shaky financial condition when it convinced the plaintiff to pay the deposit. These findings support the court's conclusion that the defendants acted with reckless indifference to the plaintiff's rights.

As to the award of attorney's fees, the defendants argue that the award cannot stand because there was no proven CUTPA violation. In part I of this opinion, however, we concluded that the court properly found that the defendants violated CUTPA. Upon our review of the record in this case, we cannot conclude that the court abused its discretion in awarding attorney's fees to the plaintiff.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff's brief to this court was due on February 19, 2021. On March 23, 2021, this court issued an order noting the plaintiff's noncompliance with this deadline and extending the plaintiff's opportunity to file its brief to April 6, 2021. The plaintiff never filed a brief. On April 7, 2021, this court ordered that the appeal would be considered on the basis of the defendants' brief and the record. The same day, the defendants filed a motion for sanctions pursuant to Practice Book § 85-1, asking this court to set aside the judgment with costs due to the plaintiff's lack of due diligence defending

the appeal. The defendants' motion was denied.

[2] As we explain subsequently, the court found that "[t]he damages for unjust enrichment and the actual damages recoverable under CUTPA . . . are the same under the facts proven." "Therefore, as long as the court's finding of liability is proper with respect to one of those counts on which the damages award is based, then the damages award, if proper in itself, would stand." *Centimark Corp.* v. *Village Manor Associates Ltd. Partnership*, 113 Conn. App. 509, 517, 967 A.2d 550, cert. denied, 292 Conn. 907, 973 A.2d 103 (2009). Because we conclude that the court's finding of liability is proper with respect to the CUTPA claim, we need not reach the defendants' claims as to unjust enrichment.

[3] The court found that "TMP used a single bank account to service its business and for expenses on multiple projects, including to pay its employees, vendors and equipment suppliers, debt service, state and federal taxes and other obligations. TMP's financing scheme depended on continued cash flow from its projects and favorable extended credit terms from vendors and suppliers to continue to operate its business and fulfill its contracts."

[4] Section 14.1.3 of the parties' contract provides: "If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Contractor and not expressly waived, such excess shall be paid to the Subcontractor. If such costs and damages exceed the unpaid balance, the Subcontractor shall pay the difference to the Contractor. The amount to be paid to the Subcontractor or Contractor, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract."

[5] On August 7, 2020, the court awarded the plaintiff reasonable attorney's fees in the amount of $13,040 and costs in the amount of $601.77 pursuant to General Statutes § 42-110g (d).

[6] The evidence in the record discloses that, after failing to fulfill its obligations to pay for the materials for the project, the defendants tried to persuade the plaintiff to sign a joint pay agreement with the suppliers. Daniel Goldstone, the managing director for the plaintiff, testified that a joint pay agreement is in essence "an agreement where when we issue payment to him, it would also be made out to a supplier so he can in turn sign over his portion of the rights to that money to pay for materials that were provided." Paige referred to this joint pay agreement as a joint check agreement. Paige described the joint check agreement as "me signing away my right to receive the check. It would have been drafted with both parties' names on it and it would go to pay for the material."

---